UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MS. K, on her own behalf and as | ) | |
| legal Guardian of her son, BW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 06-42-P-H |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT NO. 40, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDED DECISION

The plaintiff, Ms. K, has filed suit against the defendant, Maine School Administrative District 40, to obtain judicial review of a decision made by a Maine Department of Education hearing officer concerning the adequacy of the individual education plans the District offered for her son, BW, to address his special education needs, and to request reimbursement for the cost of certain private school placements. The matter is now before the Court on the parties' competing requests for judgment on the administrative record. I recommend that the Court affirm the decision of the hearing officer in all respects save one and remand Ms. K's claim relating to the 2005-2006 school year for further proceedings.

### The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491, is designed to ensure "a free appropriate public education" (FAPE) to children with disabilities. 20 U.S.C. § 1400(d). To reach this goal, Congress provides federal funding to the states, provided that they implement specific policies and procedures set forth in the IDEA. See id. § 1412(a). The general prerequisite to the receipt of federal funds is the provision of a "free appropriate

public education" in the "least restrictive educational environment" to all disabled children residing within the state. Id. §§ 1412(a)(1) & (5). By "free appropriate public education," Congress envisioned an education "that emphasizes special education and related services designed to meet the[] unique needs" of each child. Id. § 1400(d)(1). By "least restrictive educational environment," Congress sought to ensure that children with disabilities will be educated alongside non-disabled students "[t]o the maximum extent appropriate." Id. § 1412(a)(5)(A).

Pursuant to the IDEA, the unique needs of each child are to be set forth in an individualized educational program (IEP), developed by a team of individuals including the child's parents, the child's regular and special education teachers, a qualified representative of the local educational agency (LEA), and, where appropriate, the child. Id. § 1414(d). In Maine, that team is known as the Pupil Evaluation Team (PET). See Ms. M. v. Portland Sch. Comm., 360 F.3d 267, 269 (1st Cir. 2004). The IEP is a written statement that is developed, periodically reviewed (at least annually) and revised by the PET in accordance with specific procedures set forth in the IDEA. 20 U.S.C. § 1414(d)(3) & (4). In the event that parents are dissatisfied with an agency's "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child", id. § 1415(b)(6), the IDEA entitles them to present their complaints in an "impartial due process hearing," id. § 1415(f). In addition to providing parents the right to an administrative hearing, the IDEA also grants to any party "aggrieved by the findings and decision" of the hearing officer, the right to bring an IDEA "civil action" in either state court or the appropriate United States District Court. Id. § 1415(i)(2).

## Standard of Review

The Court of Appeals for the First Circuit has described the "ultimate question" in an IDEA appeal as "whether a proposed IEP is adequate and appropriate for a particular child at a given point in time." Burlington v. Dept. of Educ., 736 F.2d 773, 788 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985). Adequacy and appropriateness truly are the touchstones in IDEA cases. A LEA is "not require[d] . . . to provide what is best for a special needs child." L.T. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004). It need only provide an IEP that is "reasonably calculated to enable the child to receive educational benefits," not excellence, "and the courts can require no more." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (White, J., dissenting); see also Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992-93 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991).

The procedural task Congress has assigned to the courts in IDEA actions is to "receive" the record of the administrative proceedings, consider additional evidence offered by a party, and grant "appropriate" relief based on a preponderance of the evidence. Id. § 1415(i)(2)(B). That task has been interpreted as requiring the courts to review the administrative proceedings using a unique, intermediate standard of review that involves independent consideration of the evidence and an evaluation of the hearing officer's decision that is more vigorous than clear-error review, but less vigorous than de novo. This standard tempers the authority to grant appropriate relief in recognition of the fact that judges generally lack specialization in education policy. Rowley, 458 U.S. at 206-208; Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993). Of course, the Court's review of the evidence is to be aided by the parties, particularly the complaining party, for "the burden rests with the complaining party to prove that the agency's decision was

wrong." <u>Roland M.</u>, 910 F.2d at 991 (citing <u>Kerkam v. Mckenzie</u>, 862 F.2d 884, 887 (D.C. Cir. 1988) ("[W]e think it clear that a party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong.")). "In the end, the judicial function at the trial-court level is 'one of involved oversight,' and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." <u>Lenn</u>, 998 F.2d at 1087 (quoting <u>Roland M.</u>, 910 F.2d at 989).

### Factual Findings

BW is a 19 year old young man.  Ms. K has a limited guardianship of BW for medical and legal matters.  Ms. K resides within Maine School Administrative District 40 and, during BW's minority, she was responsible for his custody and care.  The District convened its first PET for BW during his first grade year, due to concern over his reading and writing skills, and the PET concluded that BW was entitled to special education services at that time.  (Kendra L. Bryant, Ph.D., Neuropsychological Assessment, Stip. R. at 279-80.)  BW's parents separated when BW was 8 and their divorce was not finalized for about 5 years, due to a custody dispute. In third grade BW was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and it was also noted that "concurrent emotional issues regarding changes in his family . . . were contributing to his problems." (<u>Id.</u> at 280.)  During BW's fourth grade year his mother had him evaluated for suicide risk due to certain verbalizations that reflected suicidal ideation arising from emotional upset over his parents' divorce, the absence of his father from the home, what is described as a "conflictual relationship with his mother and his brother," and frustration in school stemming from learning "difficulties."  (<u>Id.</u> at 280-81.)  A psychological assessment conducted in sixth grade suggested primarily emotional/social concerns and hyperactivity, with the only academic concern relating to written language skills.  (<u>Id.</u> at 281.)  An occupational therapy

4

evaluation conducted in the same timeframe recommended intervention geared toward minimizing distractions and providing school accommodations to account for BW's writing difficulties and his need for increased direction and feedback and some additional time to complete work at school.  (Id. at 281-82.)  BW's PET responded to this data by providing for certain services but also concluded that BW was not a qualified student with learning disabilities. (Id. at 282.)  Ms. K placed BW in a private school for his seventh and eighth grade years.  The District provided BW with the supportive services of a tutor despite his enrollment in the private program.  (Id.)  Evaluations of BW made during the seventh and eighth grade largely echoed earlier ones.  BW was easily distracted, but generally performed at an average level academically except in the area of written expression.  (Id.)

BW attended the District's public high school, Medomak Valley High School (MVHS), for ninth grade during the 2001-2002 school year.  (Id.)  Initially, the District provided certain "consultative" services but "fully mainstreamed" BW without providing any direct (one-on-one) special education services.  According to Sarah Crosby, presently the counseling director for MVHS but then a guidance counselor who had BW on her guidance caseload, she spoke with Ms. K in conjunction with his transition to MVHS and Ms. K insisted that BW take Algebra, despite the fact that his test scores indicated he was not prepared for it, and she enrolled BW in eight academic credits, despite the fact that a six-credit load was standard.  (Crosby Test., Stip. R. at 864-65.)  Three months into the school year it appeared that BW would likely obtain failing grades in Latin and Algebra without some intervention.  (Id.; Nov. 2001 PET Minutes, Stip. R. at 134.)  Among other problems, BW had missed the entire seventh week of school and, in all, was absent for all or part of 28 days of school that school year.  (Crosby Test., Stip. R. at 871-72.)  In response, the PET added "a daily check-in to assist with organizational skills," provided

BW with the option of taking tests in a different room than his classmates, added a special education study hall to his curriculum (which replaced Latin), "encouraged" his teachers to check whether he understood assignments, enrolled him in Transition Math Block 3 (letting him audit Algebra and repeat it for credit the following year).  (Bryant, Stip. R. at 283; Nov. 2001 PET Minutes, Stip. R. at 135; Compl. Investigation Report, Stip. R. at 261.)  After these modifications, BW began earning B grades, which Dr. Bryant describes as an improvement over previous years, and BW earned seven credits toward the 24 needed for graduation.  (Bryant, Stip. R. at 203; Crosby Test., Stip. R. at 870-71.)  On the social front, BW's classmates elected him to be their class president for the 2002-2003 school year.  (Bryant Assessment, Stip. R. at 283.) BW was also successful athletically.  (Crosby Test., Stip. R. at 873-74.)

During the summer of 2002, Ms. K expressed frustration toward the District's special education coordinator, accusing him of "dumbing down" BW's academic experience and suggesting that BW was not "eligible" for tenth grade because he had not earned a passing grade in Algebra.  Ms. K further asserted that BW had effectively "lost a year of high school" and demanded that the District provide BW with a private tutor over the summer so that he could catch up in math.  (Aug. 19, 2002, E-mail, Stip. R. at 141.)  This frustration likely stems from the PET's refusal to offer additional services to BW as of the end of the 2001-2002 school year. (June 13, 2002, Parent Notice, Stip. R. at 115.)  At some point during the 2002 summer, Ms. K enrolled BW in Kent's Hill School, a private school, for tenth grade.  (Bryant Assessment, Stip. R. at 283.)  The District agreed to provide tuition assistance for one year at the state's secondary tuition rate, evidently upon the Superintendent's direct intervention.  (Oct. 8, 2002, Superintendent's Letter, Stip. R. at 75; Compl. Investigation Report, Stip. R. at 261.)  Among the

reasons provided for the decision was "the difficulty of the working relationship between [Ms. K] and some of our high school special education staff."  (Id.)

BW had significant attendance problems while at Kent's Hill School and was placed on probation for poor attendance and poor grades.  (Bryant Assessment, Stip. R. at 283.)  According to Dr. Bryant, BW's attendance problems stemmed in part from depression and in part from the medications prescribed to him.  (Id.)  As of May 2002, BW had begun taking "time-released stimulant medication" to control his anxiety and it appears that these medications never worked well for him during his stay at Kent's Hill School.  (Id.)

At an August 2003 PET meeting Ms. K expressed a desire to keep BW at Kent's Hill School but the District disagreed and opined that BW ought to return to the public high school. (Id.)  Due to Ms. K's insistence that the District was failing to provide BW with necessary services, the PET recommended a neuropsychological assessment, the Bryant Assessment that I have been citing throughout.  (Id.)  That assessment was not completed before the start of the 2003-2004 school year.  Ms. K returned BW to the Kent's Hill School despite his previous problems there.  BW was plagued by the same difficulty in attendance, evidently due to the continuing failure of health care professionals to prescribe a stimulant medication that would achieve the intended result.[1]  Indeed, it appears that BW had taken over six different medications on a trial basis as of October 2003.  By the time matters were supposedly sorted out, BW had fallen too far behind from missing classes and Kent's Hill School suspended him in December 2003.  (Id. at 283-84.)

On December 15, 2003, BW was living at his mother's residence and physically assaulted her fiancé when the fiancé woke BW out of a sound sleep and yelled at him in a threatening way.

---

[1]      The District also cited this medical problem in support of its decision to provide tuition assistance for BW to attend private school.  (October 8, 2002, Superintendent's Letter, Stip. R. at 75.)

(Id. at 286.)  On December 17, 2003, Ms. K filed a due process administrative complaint with the Maine Department of Education in which she alleged that the District failed to implement or provide an appropriate IEP and breached certain confidentiality requirements.  (Dispute Resolution Request Form, Stip. R. at 318-19.)  As a consequence, neither Ms. K nor BW wished to have BW return to the District's public high school for instruction after his suspension from Kent's Hill.  (Bryant Assessment, Stip. R. at 284; Bryant Test., Stip. R. at 862.)  In January 2004 the PET convened to determine what kind of program to provide BW and, independently, Ms. K contracted with her own educational consultant to identify possible private placements for BW. (Jan. 2004 PET Minutes, Stip. R. at 312-16; Educ. Consulting Agreement, Stip. R. at 155.) During the meeting, the matter of BW's suspension from Kent's Hill School was addressed.  Ms. K described the problem as stemming from BW's failure to get up in the morning and, according to the minutes of the meeting, Ms. K "pondered whether his behavior was either a result of mental illness or a learning disability."  (Jan. 2004 PET Minutes, Stip. R. at 312.)  She reported that BW had attempted suicide during the summer following his ninth grade year.  (Id. at 313.) She also reported significant problems at home and that BW had extremely volatile mood swings.  Among other issues, Ms. K reported the assault against her fiancé and opined that BW could do well if he were not at home, but not if he remained at home.  (Id. at 314.)  This opinion is contradicted by the difference between BW's generally successful performance during ninth grade and his poor performance and depression in the residential private school placement.  It also appears to overlook entirely the negative impact that BW's stimulant medications were having on BW's academic and home experience.

The PET decided to establish an interim IEP for BW pending the results of the Bryant Assessment.  The meeting resulted in an agreement that BW would receive one-on-one tutoring

for three-to-four hours per day, five days per week, with the district to provide transportation services to and from tutoring. (Id. at 315-16.) BW was pleased with this arrangement. (Bryant Assessment, Stip. R. at 119.)

Dr. Bryant conducted her neuropsychological evaluation of BW between December 2003 and January 2004. Her evaluation recounts much of BW's academic and personal history and is a record source upon which both parties rely heavily. I have summarized Dr. Bryant's many findings above and find them to be the most reliable evidence available in the administrative record for purposes of understanding BW's relevant background. Before turning to her more clinical assessments, I find relevant certain findings Dr. Bryant made regarding BW's self-assessment. In particular, BW acknowledges that his relationship with his mother is a difficult one and that he is sometimes verbally abusive to her. Significantly, BW does not appear to have ever asserted that the relationship is untenable or of such difficulty that living in Ms. K's home ever presented the kind of hurdle that would undermine his ability to obtain educational benefit from a public school day program, as opposed to a residential private school placement. In fact, he opined that his difficulty at Kent's Hill School arose from living in his own room, without a roommate or someone to help keep him "on track" with his schedule. (Bryant Assessment, Stip. R. at 287.) Although it may have proved difficult for Ms. K, my interpretation of the record is that BW actually had a good year of high school while he was living at home and attending MVHS during the ninth grade, when his mother was available to oversee his attendance and when various provisions set forth in his November 2001 IEP were in place to, among other things, keep him on task. I do not agree with Ms. K's position that this was a lost year of high school. BW's failure to succeed in Algebra and Latin that year was not, in the big picture, evidence that the District was failing to attend to his needs. To the contrary, it is to the District's

credit that it interceded in November and did so in such a way that BW was able to earn B grades, without removing him from the mainstream setting and without disrupting his successful social experience.

Dr. Bryant put BW through a battery of tests. Among other interesting results was an indication that BW demonstrated average or above average ability in most categories tested even when he was not medicated, although his results improved in some categories with medication. In many categories BW was in the superior range of functioning. BW exhibited a diminished "response control ability" (an array of skills including impulse control) whether medicated or not. Notably, this ability was actually worse with medication. (Id. at 291-92, 300.) Another area of difficulty proved to be BW's ability to "learn verbal information after only one auditory exposure," which Dr. Bryant found to be "severely impaired," though the rate of learning became average with repetition. (Id. at 293.) BW's recall of visual information is mildly impaired. (Id. at 294.) BW's reading and math skills remain an issue for him as well; although his reading and writing skills are generally average as compared to age-matched peers, Dr. Bryant considered test results to be below expectations for one with his above average IQ. (Id. at 289, 295-96.) Ironically, despite the fact that BW's medication made his response control ability worse, the medication appears to have had a positive effect on his ability to complete and remain attentive during testing. (Id. at 294-95.) In particular, BW achieved above average results in math reasoning with medication, though he needed increased time to answer questions. (Id. at 295.)

Dr. Bryant's assessment of BW's psychological functioning is that BW is "significantly depressed and anxious" with suicidal tendencies approaching significance. (Id. at 296.) Dr. Bryant observed that BW "appears to vacillate between the experience of being smothered by others and feeling discarded by them." (Id. at 297.) His depression appears to stem from his

familiarity with disappointment in his family life and academic experience and with criticism. (Id. at 296-97.)  These stressors, understandably, interfere with his ability to process and retain academic information.  Dr. Bryant opines that BW developed coping mechanisms to filter his experience of the external world that may have served to protect him in his childhood but which have come to be obstacles in regard to higher learning.  (Id. at 297.)  Additional psychological tests indicated a diagnosis of attention deficit disorder (inattentive type), with a possibility that that lone diagnosis "would be inadequate to completely capture [BW's] current difficulties," although that concern appears to arise exclusively from scores that Ms. K gave to BW in response to a particular diagnostic instrument that she completed (rather than one that Dr. Bryant produced).  (Id. at 297-98.)  The record leaves me with the perception that Ms. K has some tendency to overstate BW's problems and that that tendency has served as one causative factor for his depression and anxiety.  In any event, BW's emotional and anxiety issues were regarded by Dr. Bryant as sufficient to support a finding of "other health impaired" status to justify academic assistance and neither party has voiced any objection to that finding.  (Id. at 301.)

    With respect to fashioning an IEP for BW, Dr. Bryant opined that although a public school setting could afford BW with the services he needed, he should not return to MVHS for instruction because he indicated that he would feel stigmatized there.  (Id.)  In addition, Dr. Bryant opined that it would be "best" for BW to stop living with his mother.  (Id.)  As for academic structure, Dr. Bryant opined that BW needed breaks between classes to absorb academic information because the presentation of new information to BW has a significantly greater tendency to override immediately preceding information, as compared with the average student.  In addition, Dr. Bryant opined that BW ought to have access to another student's notes or some other "good written material" because his attention disorder tended to impede his ability

to take effective notes.  (Id.)  Dr. Bryant also advised that BW receive his assignments in writing or that his teachers check with him to ensure that he has written down assignments correctly. (Id. at 302.)  She also recommended a brief daily tutorial to check-in with BW and help him plan his approach to his assignments.  (Id.)  With regard to tests, Dr. Bryant advised that BW be given a separate room to prevent distractions and that he not be subject to the same time limits as other students.  (Id. at 303.)  She also "strongly advised" a regular course of psychotherapy, at least weekly, to address emotional disturbances and she suggested that his stimulant medication be discontinued.  (Id. at 305.)

Dr. Bryant deferred the issue of program placement to the parties, but advised that BW remain in the tutoring program through the end of the school year to avoid placing him in a new class of students in mid-year.  (Id. at 303.)  She did note that her recommendations could be provided within most school settings, including public schools.  (Id.)  Dr. Bryant took some pains to distinguish BW's academic programming needs from his emotional needs.  (Id.) Elsewhere in her assessment, however, she recognizes that the two are connected.  (Id. at 304.) She indicated that there was "agreement"[2] that BW "should not continue living with his mother right now."  (Id.)  Due to what was obviously BW's substantial need and desire to be closer to his father, Dr. Bryant thought it would be "ideal" if BW could live with his father rather than any third party.  (Id.)  She opined that a move to another residence should come "as quickly as possible."  (Id. at 305.)

The PET convened on February 2, 2004, to consider Dr. Bryant's neurological assessment.  (Feb. 2, 2004, PET Minutes, Stip. R. at 269-71.)  Ms. K and her fiancé both attended the meeting.  BW's father also participated via speakerphone.  (Id. at 269.)  Ms. K reported that BW had been "off" stimulant medication for two weeks and was calm.  Her fiancé

---

[2]     Presumably, this agreement was internal to the family.

reported that this change and BW's work with his tutor had resulted in a "major positive change" at home.  Strangely, he also indicated that his assault charges against BW might be dropped depending on the outcome of the PET meeting, as though the charges were being used as some kind of tool to influence the PET.  (Id.)  BW's father indicated that he would like BW to come to the Netherlands to live with him and attend the International School of the Hague.  (Id.)  Leslie Goldberg, the educational consultant hired by Ms. K to investigate possible educational placements for BW, also participated by speakerphone.  She opined that BW ought to attend a wilderness program to remove him from the stress of living at home.  (Id. at 270.)  Ms. K favored this placement as well.  (Id.)  Options for alternative living arrangements were discussed for some time before Richard Kauffman, the District's Director of Student Services, indicated that BW's living arrangements were not a subject for the PET to resolve; that its duty was to develop an appropriate IEP based on BW's current residential situation, noting that Dr. Bryant concluded that the necessary services could be provided in a public school setting and that a placement could be made in a public high school other than MVHS.  (Id.)  Consensus emerged that emotional counseling services should be added to BW's IEP.  The PET also decided to pursue having BW attend another area public high school.  In accordance with Dr. Bryant's recommendation, the PET determined that BW would be labeled as having "multiple disabilities," including emotional disabilities, that justified special services, that tutoring would continue until a regular school placement could be found by the District, that psychotherapy would be included in BW's IEP (preferably in the school setting) and that the District would otherwise provide transportation, if necessary, to ensure consistency.  (Id. at 271.)

On February 17, 2004, a report issued on Ms. K's December 17, 2003, complaint against the District.  The state investigator found in favor of the District.  (Compl. Investigation Report,

Stip. R. at 263-66.)  Note that this administrative proceeding does not give rise to the instant civil action but serves only as relevant background to the pending dispute.

On March 18, 2004, Ms. K wrote to Mr. Kauffman to complain that BW had missed "several" dates with his tutor and "two of four" therapy sessions because of transportation issues. (March 18, 2004, E-mail, Stip. R. at 98.)  Ms. K essentially demanded another PET meeting to advocate for a revised IEP based on a failure of the District to fulfill its obligations.  (Id.)  Over the intervening weeks BW had become despondent that he was not yet introduced to a school setting to be among his peer group and was missing out on extracurricular activities by virtue of being at home and receiving tutoring outside of MVHS.  However, Dr. Bryant did not believe that inserting BW into a new public school setting in the middle of the school year would lead to a successful experience and Ms. K and BW had declined to have BW receive his tutoring at MVHS where a peer group was already available.  In any event, Ms. K characterized BW as being "in crisis" and it appears that on one occasion he threw a honey jar through her stove.  (Ms. K Test., Stip. R. at 880-883.)  On March 21 Ms. K notified Mr. Kauffman that BW would attend the Walkabout Treatment Program in Utah (now called Outback Therapeutic Expeditions), an eight-week therapeutic program for troubled teens, starting the next day.  Ms. K described the move as a "medical placement" and stated that it was made on the advice of BW's psychiatrist, Dr. Teresa Hermida.  (March 21, 2004, E-mail, Stip. R. at 242; see also April 6, 2004, Walkabout Letter, Stip. R. at 241; Ms. K Test., Stip. R. at 631-33.)  The program included an academic component made available by the wilderness experience, including language arts, natural science, ancient civilizations, and physical education, for which the District eventually awarded BW two academic credits.  However, it must be noted that the placement of BW in the program cut short his academic tutoring program, preventing the completion of three out of five

courses of study, making the wilderness program, in effect, the only program actually completed by BW during the 2003-2004 school year.  (MVHS Transcript, Stip. R. at 394.)

Mr. Kauffman wrote Ms. K on May 14, 2004, regarding BW's anticipated May 17 return. According to his letter, Ms. K had indicated a desire to have the tutoring program recommence until the end of the academic year, which Mr. Kauffman considered to be in accordance with Dr. Bryant's earlier recommendation.  (May 14, 2004, Kauffman Letter, Stip. R. at 226-27.)  Mr. Kauffman committed to obtaining a tutor and arranging for counseling and transportation services, plus "procuring the cooperation of an area high school so that [BW] can be returned to a regular school setting for the 2004-2005 school year."  (Id.)

The PET convened on May 27, 2004.  (PET Minutes for May 27, 2004, and June 16, 2004, Meetings, Stip. R. at 201.)  The meeting was held specifically to establish an IEP for the 2004-2005 school year.  (Id.)  Ms. K expressed her disapproval of the "expediency" of placing BW in another public high school.  (Id.)  She expressed her intent to have the District pay for a private school placement.  (Id. at 202.)  The meeting was continued until June 16, 2004, evidently because of a scheduling problem.  Attorney Rita Furlow accompanied Ms. K to the June PET meeting as her advocate.  As of June 16, 2004, BW's tutoring and counseling were back in progress.  (Id.)  BW reported that counseling was going well.  (Id.)  Mr. Kauffman indicated that BW would need to decide whether to continue with his tutoring program through the summer or take an extra year of high school in order to earn sufficient credits for graduation. (Id.)  Attorney Furlow introduced a copy of the discharge summary from Walkabout.  It recommended placement in an emotional growth boarding school but did not address any need for special education services.  (Id.; Walkabout Diagnoses, Stip. R. at 229-231.)  Walkabout's professional staff diagnosed emotional and impulsivity issues stemming from family matters and,

particularly, from BW's relationship with his mother.  (Walkabout Diagnoses, Stip. R. at 229-30.)  In addition, Walkabout flagged a marijuana abuse problem that had arisen from BW's efforts to "escape" from his problems.  (Id. at 230.)

Attorney Furlow and Ms. K expressed the opinion that a boarding school was required to meet Dr. Bryant's recommendations.  It became apparent that Ms. K and BW were focusing on the Hyde School in Bath, Maine.  (May 27, 2004, PET Minutes, Stip. R. at 202.)  BW was required to succeed in a summer challenge program at the Hyde School in order to qualify for admission in the fall and was already signed up to begin that program shortly, which would obviously interfere with his ability to complete his tutoring program and receive full academic credit for it.  (Id.)  Before the end of the meeting, Ms. K provided written notice that BW would be placed in a private school and that reimbursement would be sought from the District.  (Id. at 202-203; June 16, 2004, Ms. K Letter, Stip R. at 213.)  Notwithstanding, the PET prescribed that BW receive special education services in a public high school setting for the 2004-2005 school year consisting of consultative special education services (a case manager to check weekly with all teachers on BW's progress and liaison with parents), weekly psychological counseling, direct special education services provided during a forty-minute, daily study hall, and two hours of weekly tutoring services to help him succeed in a college preparatory academic program.  (June 2004 PET Minutes, Stip R. at 203; June 2004 IEP, Stip. R. at 205-206.)  Transportation services were also called for but were left open until it was determined which area high school would provide BW's program.  In addition, the IEP specified that any academic assessments would take place under favorable conditions, with a quiet setting, easier time limits, and frequent breaks, among other things.  (June 2004 IEP, Stip. R. at 205.)  Ms. K complains that no specific public high school had committed to accepting BW as of the June 2004 PET meeting.  However, the

16

record reflects that advancement of such a placement (specifically at Lincoln Academy) required some cooperation from Ms. K and that this fact was communicated to her in May of 2004 by Mr. Kauffman.  (May 25, 2004, Kauffman E-Mail, Stip. R. at 222-23.)

BW attended the Hyde summer program and was accepted into Hyde's high school program.  Ms. K notified Mr. Kauffman of this fact on August 24, 2004.  (Aug. 24, 2004, Ms. K Letter, Stip. R. at 199.)  Hyde offers a boarding school program with dormitory living supervised by "dorm parents," staff members that live in the dorms with the students.  (Truluck Test., Stip. R. at 891-92.)  Hyde does not offer a therapeutic program or in-house special education support other than tutors.  (Id. at 895-96.)  Despite the placement at Hyde, the District continued to provide BW with counseling and tutoring services while he was there, as well as transportation to those services.  (Kauffman Test., Stip. R. at 720-21.)  BW had a successful 2004-2005 school year at Hyde and Ms. K enrolled him for the 2005-2006 school year as well.  In the summer of 2005 the District notified Ms. K that it would not convene the PET to address BW's 2005-2006 IEP because Ms. K had placed BW outside the district in a private school setting contrary to what the PET had "ordered."  (June 15, 2005, Kauffman Letter, Stip. R. at 172.)  Mr. Kauffman cited 20 U.S.C. § 1412(a)(10)(i) [sic] for the contention that the District no longer had authority to determine BW's IEP.  (Id.)

Ms. K filed an administrative complaint in September 2005 that resulted in a due process hearing before Department of Education Hearing Officer Peter Stewart, Esq.  Mr. Stewart issued his administrative decision on January 20, 2006.  (Special Educ. Due Process Hr'g, Stip. R. at 556.)  Although the family articulated seven distinct issues (id. at 558 & n.2), they can be more succinctly summarized.  In short, the issue is whether the District violated its obligations to BW in any or all of the three school years following his suspension from the Kent's Hill School and

what relief, if any, is called for in the event that a violation is found.  Mr. Stewart concluded that "the [IEPs] at issue in this matter were reasonably calculated so as to provide the student with meaningful educational benefit and thus provide him with a free and appropriate public education" and, consequently, denied relief to the family.  (Id. at 567.)  However, he also dismissed Ms. K's claim concerning the 2005-2006 school year on the legal ground that the District was not authorized to review BW's IEP due to certain amendments to the IDEA that became effective in July 2005, discussed more fully below.  (Pre-Hearing Mem., Stip. R. at 444 (dismissing "issue 4").)  It is Ms. K's burden to demonstrate that these rulings were wrong, Roland M., 910 F.2d at 991, and I address her challenges to the hearing officer's findings in the discussion set forth below.

## Discussion

I address the pending claims in chronological order according to the relevant school year.

### A.   The 2003-2004 School Year.

#### 1.   *The February 2004 IEP.*

Ms. K contends that the IEP offered by the District following BW's suspension from Kent's Hill violated the IDEA because the IEP developed in February 2004 was not appropriately *implemented*.  (Pl.'s Br. at 13-16.)  She complains that she was told to contact a behavioral health care organization to get a case manager and to find her own counselor for BW's emotional issues.  (Id. at 13.)  In addition, she complains that transportation failures caused BW to miss some tutoring sessions.  (Id. at 14.)  She also faults the District for not immediately identifying an alternative public high school in which to place BW.  She cites the e-mail she wrote on March 18, 2004, in which she complained that BW missed two counseling sessions and an unspecified number of tutoring dates.  (Stip. R. at 98.)  She also cites additional correspondence that reflects

18

that the District offered to transport BW to counseling only if it proved necessary to ensure consistency.  (Stip. R. at 34.)  On these issues the hearing officer found that the District experienced some difficulty finding a counselor for BW, but contracted with the counselor recommended by the family, and that there were certain insignificant "transportation miscues" that did not prevent the District from "substantially implement[ing]" the IEP prior to the unilateral Walkabout placement.  I find that the materials cited by Ms. K do not demonstrate the error of these findings.  The fact that BW missed two counseling sessions does not strike me as evidence of a failure to implement the February IEP.  The important factor here is that counseling was in place within a reasonable timeframe and that transportation services were provided to ensure consistency.  I also fail to see the harm in having Ms. K assist with the identification of an appropriate counselor.  The family obviously has an interest in participating in this process and it is very likely that Ms. K would have attributed malfeasance to the District had it not followed her recommendation.  Again, the important factor here is that counseling services were in place within a reasonable timeframe.  I find Ms. K's criticism in regard to the missed tutoring sessions even less significant.  These services reflected a new placement and it is to be anticipated that some "transportation miscues" might arise at the outset.  Notably, Ms. K and BW both expressed a preference for the resumption of these services upon BW's discharge from the Walkabout program.  As for the failure to place BW in another public high school setting before the Walkabout placement, I conclude that the IEP did not call for such a placement at that time, but only specified that such a placement would be pursued as part of a future IEP for the subsequent school year, not that it would be a component of BW's transitional placement with his tutor, Mr. Wilson.  Moreover, this delay was in keeping with Dr. Bryant's recommendation.  As the hearing officer aptly concluded:

> The fact that the school could not find another high school quickly does not render this IEP inappropriate, especially given the advice of Dr. Bryant that the student would be best served by completing the school year in the tutorial program because he would likely have a very difficult time entering a new academic situation in the middle of the school year.

(Special Educ. Hr'g, Stip. R. at 569.)  I add only that it is reasonable to expect such a step to involve some administrative delay, particularly as it became an issue more than halfway through the academic year.  I find that the counseling and tutoring services were implemented in a reasonably prompt and consistent manner and do not find any error in the hearing officer's ruling as to the implementation of the February 2004 IEP.

As for the appropriateness of the IEP, Ms. K appears only to challenge the District's failure to order a residential treatment program for BW following the issuance of Dr. Bryant's neurological assessment.  I reject this challenge because Dr. Bryant did not opine that a residential placement was necessary for BW to make educational progress even if she did believe that it would be best overall (and not just academically) for BW to move out of his mother's home.  Even had she made an unequivocal recommendation for a private boarding school placement, I believe that the preponderance of the evidence still would have supported the District's IEP because, most significantly, BW had previously succeeded in the public school setting during his ninth grade year, once special education services were provided, and he had utterly floundered academically when placed in boarding school for the tenth grade.  Even though it was a problem for BW to continue living with his mother in terms of his emotional well-being, and even though BW's emotional upset interfered to a degree with his academic performance, BW's ability to succeed during the ninth grade once special education services were put in place demonstrated that living with his mother did not prevent him from making educational progress.

2.      *Ms. K Should Not Be Reimbursed for the Walkabout Placement.*

Ms. K argues that she is entitled to reimbursement for the Walkabout program.  She cites this Court's decision in Lamoine School Committee v. Ms. Z, 353 F. Supp. 2d 18 (D. Me. 2005), in support of her position that placements in wilderness programs are appropriate in "certain situations."  (Pl.'s Br. at 16-17.)  The District responds that such placements are not called for unless they are essential for a student to make any educational progress, citing Abrahamson v. Hershman, 701 F.2d 223, 227 (1st Cir. 1983).  (Def.'s Br. at 13.)  In Lamoine, the Court affirmed a hearing officer's determination that certain wilderness programs were appropriate for a child whose therapeutic counselors had diagnosed depression that "destroyed his ability to attend school," Lamoine Sch. Comm., 353 F. Supp. 2d at 22, cautioned that a public school placement "would likely result in his breakdown," id. at 23, and specifically recommended "residential mental health treatment," id. at 24, and an "emotional health boarding school," id. at 26, including 24-hour support, id. at 40.  The Court also noted that the "record is replete with evidence that the services provided by Lamoine were not successful." Id. at 41.  In other words, the Lamoine case differed from the instant case both procedurally and substantively.  The District had lost at the administrative level and the student in question had what appeared to be an unquestionable need for a residential placement in order for there to be any likelihood for educational benefit.  In contrast, the hearing officer found in favor of the District in this case and, more importantly, a preponderance of the evidence demonstrates that BW was capable of succeeding in the public school setting academically with the assistance of certain counseling and special education services, and socially without any need for services.  BW was bound for just that sort of IEP in March 2004, pending the temporary tutoring arrangement necessitated by BW's untimely suspension from the Kent's Hill School.  Ms. K has failed to demonstrate that the

tutoring program failed to provide BW with an adequate and appropriate placement under then-existing circumstances to afford BW with educational benefit.

The IDEA provides that a local education agency need not 'pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." 20 U.S.C. § 1412(a)(10)(C)(i).  Reimbursement for such a placement may be ordered only if it can be found, among other things, "that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." Id. § 1412(a)(10)(C)(ii).  Ms. K argues that the Walkabout placement was appropriate because it was better for BW than the temporary tutoring arrangement that left him isolated at home.  She states that he was in crisis and required a residential placement.  She adds that the District awarded him two credits for completing the program, whereas it awarded only 1.5 credits for the tutoring program.  (Pl.'s Br. at 16-17.)  My finding is that BW only failed to receive additional credits for the tutoring program because of Ms. K's unilateral placement of BW in the Walkabout program and then in the Hyde School's summer program, which placements prevented BW from completing his course work under the tutoring program.  I do not find that these circumstances demonstrate by a preponderance of the evidence that the tutorial program was an inappropriate placement for BW.  Nor do I find that the record demonstrates by a preponderance of the evidence that BW was in a real "crisis" at the time of the placement.  The evidence Ms. K cites in support of BW's "crisis" condition and of Dr. Hermida's Walkabout recommendation is, exclusively, her own testimony and e-mail correspondence.  Because the existing IEP was appropriate, the request for reimbursement for

the Walkabout program should be denied.[3]  In my view, a contrary ruling under the circumstances of this case would essentially put this Court in the position of establishing as an education policy that children with depression stemming from family conflict must be provided an IEP having a residential component whenever a treatment provider identifies a link between clinical depression and the home environment and the child's depression merely has some impact on academic performance.  That is certainly not the mandate given to the Courts under the IDEA.  See Abrahamson, 701 F.2d at 227 ("[T]he Act does not authorize residential care merely to enhance *an otherwise sufficient* day program.  A handicapped child who would make educational progress in a day program would not be entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential.").

**B.     The 2004-2005 School Year.**

Ms. K asserts that she had good cause to conclude that the District would fail to implement an appropriate IEP for the 2004-2005 school year because of its failure to get BW started with necessary services immediately after his return from Walkabout and because of its belief that the IEP offered in ninth grade had worked for BW.  (Pl.'s Br. at 18-20.)  In particular, she asserts that counseling services were never put in place between the May 27, 2004, PET meeting and the conclusion of the 2003-2004 school year.  (Id. at 18.)  I am unable to corroborate this assertion.  The record sources that Ms. K cites simply do not support it.  (See May 14, 2004, District Letter, Stip. R. at 226; Ms. K. Test., Stip. R. at 635 (page 55 of the Nov. 29, 2005, hearing transcript).)  I do note that the minutes reflect that counseling services were in

---

[3]     Parenthetically, although the hearing officer did not address the matter, it appears to be clear from the record that Ms. K did not give the District adequate notice of either the alleged crisis at home or of the fact that she was placing BW in the Walkabout program.  The notice she provided of that placement was a one-day notice.  This procedural failure could independently support the hearing officer's denial of reimbursement for that program.  20 U.S.C. § 1412(a)(10)(C)(iii).  Notably, the record cited by Ms. K is devoid of any evidence that compliance with the IDEA's notice provision would have been likely to result in physical or serious emotional harm to BW.  Id. § 1412(a)(10)(C)(iv).

place sometime between May 27 and June 16.  (PET Minutes for May 27, 2004, and June 16, 2004, Meetings, Stip. R. at 201.)  In any event, I do not find that such a brief delay is weighty enough to support a finding that the IEP was not implemented or that Ms. K was justified in believing that any future IEP would not be implemented, particularly as BW reported on June 16 that counseling was going well at that time.  Ms. K next argues that the 2004-2005 IEP "was essentially the same IEP that was offered to BW during [ninth] grade [that] was shown to not adequately address his unique needs, which had changed little over the preceding years."  (Pl.'s Br. at 18-19.)  I do not find this argument to be persuasive at all.  The 2004-2005 IEP offered significantly enhanced services and implemented all of Dr. Bryant's academic recommendations.  In particular, the District added psychological counseling services, daily direct special education services and weekly tutoring services.  If, as Ms. K contends, BW's unique needs had changed little since his ninth grade year, when he demonstrated educational progress, then BW would more likely than not have had greater success during the 2004-2005 school year with the help of these additional services.  I also note that if BW's needs had changed little since his ninth grade year then there was little cause for Ms. K to insist upon a residential placement as part of BW's 2004-2005 IEP.  Moreover, Ms. K's fiancé reported at the February 2004 PET meeting that there had been a "major positive change" in BW's behavior since his stimulant medications had been discontinued.  (Stip. R. at 269.)  This fact also weighs against a finding that BW needed a residential placement for the 2004-2005 school year.

Ms. K next contends that she had no reason to believe that the District would have secured a place for BW in either Lincoln Academy or Rockland District High School.  (Pl.'s Br. at 19-20.)  I do not consider the existing record to be capable of supporting a finding that the District was unlikely to live up to its promise to secure such a placement.  The record tends,

24

rather, to reflect that Ms. K was not willing to participate in the process of communicating with administrators at another public high school to facilitate such a placement.  I conclude that the preponderance of the evidence supports the hearing officer's conclusion that the 2004-2005 IEP "would have provided [BW] an opportunity to obtain meaningful educational benefit" and I conclude that such benefit would have been provided to BW in a mainstream setting.  (Special Educ. Due Process Hr'g, Stip. R. at 572.)  That finding precludes an award of tuition reimbursement under the IDEA for the 2004-2005 school year.  20 U.S.C. § 1412(a)(10)(C)(ii).

## C.   The 2005-2006 School Year.

Ms. K contends that the District violated BW's rights under the IDEA by failing to develop an IEP for him in relation to the 2005-2006 school year and that the hearing officer erroneously dismissed this claim based on his finding that the District was no longer charged with that obligation due Ms. K's unilateral placement of BW outside of the District.  (Pl.'s Br. at 28-32.)  Under ordinary circumstances, the 2004-2005 school year would have been BW's final year of high school.  However, due to his suspension from the Kent's Hill School, and his subsequent failure to earn full credit for his tutoring program due to his placement at both Walkabout and the Hyde School, BW lacked sufficient credits to earn his high school diploma upon completion of the 2004-2005 school year.  Nevertheless, the IDEA provides that "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school."  20 U.S.C. § 1412(a)(1)(A).  Although there are certain exceptions to this rule, see id. § 1412(a)(1)(B), the District does not suggest that BW was disqualified on account of his age from obtaining a FAPE during the 2005-2006 school year.  Instead, the District argues that the duty to develop an IEP for BW shifted to the Maine LEA

(local education agency) that administers the public schools in Bath, where the Hyde School is located.  In support of that position, the District cites subsections (a)(10)(A) and (a)(10)(B) of section 1412, which was amended in 2004 by the Individuals with Disabilities Education Improvement Act of 2004, 108 P.L. 446 (IDEIA).  These amendments had an effective date of July 1, 2005.  See 20 U.S.C. § 1412 (hist. and stat. notes) (Supp. 2006).

Subsection (a)(10)(A) concerns the rights of children enrolled in private schools by their parents and makes clear that the States and their LEAs are obligated to provide special education services under the IDEA to children in private schools and may provide such services on the premises of the private school in accordance with the provisions set forth therein.  Id. § 1412(a)(10)(A)(i).  Subsection (a)(10) provides that states receiving assistance under the IDEA must take measures to identify and locate special education students who have been placed in private schools by their parents in order to ensure "equitable participation" by such students in state IDEA programs.  Id. § 1412(a)(10)(A)(ii); see also id. § 1412(a)(3) (concerning the "child find" obligation generally).  Subsection (a)(10)(A) further provides that states or their LEAs must consult with private schools to facilitate the provision of appropriate services to special needs children in the private school setting and it specifies certain procedural safeguards to encourage cooperation and compliance between the LEA and the private school.  Id. § 1412(a)(10)(A)(v)-(vii).[4]

The District focuses its argument on the following wording of subsection (a)(10)(A)(i):

> To the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools *in the school district served by a local educational agency,*

---

[4]    Subsection (a)(10)(B) concerns the rights of children enrolled in private schools by the state or its appropriate LEA.  It simply provides that the state or the LEA must ensure that state educational standards are met by the private schools to which children are referred and that these children have "all the rights" they would have if they had been served in the public school setting.  Id. § 1412(a)(10)(B).

provision is made for the participation of those children in the program assisted or carried out under this part.

Id. § 1412(a)(10)(A)(i).  The District construes this language as an instruction from Congress that the only LEA authorized to carry out the objectives of the IDEA for a child placed in a private school by his or her parents is the LEA in which the private school is located.  (Def.'s Br. at 31-32.)  I disagree with this assertion and believe the hearing officer erred as a matter of law when he read the IDEIA as relieving the District of all responsibility for reviewing BW's PET under the circumstances of this case.  Section 1412 is addressed to "state eligibility" for assistance under the IDEA (now reauthorized as the IDEIA).  It is not addressed to the task of specifying which LEA in a state must carry out the obligations owed to the children with disabilities residing in the state.  20 U.S.C. § 1412(a)(1).  Indeed, section 1412 provides generally that a state must have "in effect policies and procedures to ensure that [it] meets each of the . . . conditions" listed therein.  Id. § 1412(a).  Such a statutory provision cannot fairly be read to dictate any specific policies and procedures such as which LEA must carry out those tasks necessary for a state to meet the eligibility requirements for IDEIA funding.  If such a provision were to be located anywhere in the statutory scheme, one would expect it to be located in either section 1413, which governs "local educational agency eligibility," or in section 1414, which even more narrowly governs the development of IEPs.  Notably, neither of these sections appears to free an LEA of responsibility for an IEP simply by virtue of a parental placement at an out-of-district, but in-state, private boarding school.  Nor is it plain that the statutory revisions effectuated through the IDEIA were meant to override preexisting state policies and procedures relating to the "jurisdiction" of LEAs over individual children.  I believe the hearing officer erred

as a matter of law when he read the IDEIA as relieving MSAD # 40 of all responsibility for developing an IEP and providing special education services in these circumstances.[5]

Because the hearing officer's dismissal of the claim for reimbursement for the 2005-2006 school year was founded upon a legal error, the Court should remand that claim for further proceedings. Even if Ms. K is not entitled to tuition reimbursement on account of a finding that the District afforded a FAPE prior to BW's enrollment at the Hyde School, I note that the District provided BW with counseling and tutoring services while he was enrolled at the Hyde School in 2004-2005 and it appears to have discontinued these services for 2005-2006. If those services were privately contracted for by Ms. K, the hearing officer might well require the District to reimburse her for those limited services. After all, what is clear from a reading of the IDEIA amendments, particularly section 1412(a)(10)(A), is that LEAs and the states they serve have a duty to ensure "equitable participation" by children placed in private schools, "to the extent consistent with law," including through the provision of special education services in the private school setting. Id. § 1412(a)(10)(A)(i)(III), (ii)(II) & (vi). It seems unlikely there is any basis for tuition reimbursement based on the District's failure to review BW's IEP in 2005, because it seems that there were no material changes in BW's special education needs or in Ms. K's intentions to keep BW at the Hyde School regardless of whether the District offered a FAPE to BW. Compare 20 U.S.C. § 1414(d)(2) (requiring that an IEP be "in effect"[6] at the beginning of each school year) with § 1414(d)(4) (requiring periodic review of a child's IEP, at least

---

[5]      Indeed, the hearing officer, like the District, appears to have viewed the IDEIA amendments as giving the District carte blanche to cut BW loose, without any duty to even assist in the transfer of his IEP to the other Maine district, despite the fact that the pertinent amendments are obviously designed to require states to prevent parentally placed students from falling through the cracks and losing the federally funded special education services they are entitled to. I cannot stress forcefully enough my opinion that the District's use of the IDEIA as some kind of trap door through which to jettison a special education child who is parentally placed in a private school because of parental dissatisfaction with the IEP subverts, utterly, the most basic objective of the IDEIA.

[6]      The District did not assert that BW's IEP was being revoked, only that responsibility for the review of his IEP had shifted to another district. (June 15, 2005, Kauffman Letter, Stip. R. at 172.)

annually); see also Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 811-12 & n.23 (5th Cir.

2003) ("The other circuits that have addressed this question head on have consistently held that

procedural defects alone do not constitute a violation of the right to a FAPE unless they result in

the loss of an educational opportunity . . . [and] [w]e do so today.") (collecting opinions from the

Courts of Appeals for the Fourth, Sixth, Ninth and Tenth Circuits); Gray v. O'Rourke, 48 Fed.

Appx. 899, 901-902 & n.6 (4th Cir. 2002) (unpublished opinion) (affirming ALJ's decision that

parent's unilateral placement of child at private school relieved school district of responsibility to

review child's IEP).  These cases reflect that reimbursement under the circumstances of this case

should be limited to redress only the actual "deprivation of educational benefits."  Roland M.,

910 F.2d at 994-95.  These issues should be addressed by the hearing officer on remand, as

requested by Ms. K (Pl.'s Br. at 32), particularly as a Department of Education hearing officer

will have first-hand knowledge of state policy and procedure related to which Maine LEA

(school district) had responsibility for review of a Maine child's IEP circa July 2005, under

circumstances where the child is attending a Maine private school located outside of the child's

home district.  Maine procedure and policy may well have shifted that burden to the LEA where

the Hyde School is located.   My concern is the hearing officer seems to have concluded that a

shift was mandated by the IDEIA in circumstances such as these, and I simply cannot read such a

purpose into the amendment.  In addition, remand is advisable because an award of

reimbursement for special services or some form of a compensatory education, if any is called

for, would be equitable in nature and would require consideration of various factors that were not

previously addressed by the hearing officer and are not readily ascertainable by this Court on the

existing record and briefs.  Alternatively, the Court has the option of conducting additional

proceedings itself in order to supplement the record and decide these matters independently.  See

<u>Murphy v. Timberlane Reg'l Sch. Dist.</u>, 22 F.3d 1186, 1191 (1st Cir. 1994) (discussing some of the appropriate considerations that might be brought to bear when deciding which course to take).  I recommend the former course.

### Conclusion

For the reasons set forth above, I **RECOMMEND** that the Court **GRANT** the District's request for judgment on the administrative record, **IN PART**, by affirming all aspects of the hearing officer's ruling except for his dismissal of Ms. K's claim related to the 2005-2006 school year, and remand that matter for further proceedings.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  October 26, 2006